# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| **Lt. Commander KENNETH J. WHITWELL,** | : | |
| **U.S. Navy,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **C.A. No.** |
| **v.** | : | |
| | : | |
| **ARCHMERE ACADEMY, INC., a Delaware** | : | |
| **corporation; CATHOLIC DIOCESE OF** | : | **TRIAL BY JURY DEMANDED** |
| **OF WILMINGTON, INC., a Delaware** | : | |
| **corporation; Rev. EDWARD SMITH,** | : | |
| **individually and in his official** | : | |
| **capacity; and Rev. MICHAEL A.** | : | |
| **A. SALTARELLI, in his official** | : | |
| **capacity,** | : | |
| | : | |
| **Defendants.** | : | |

## COMPLAINT

1.  This is a diversity case seeking money damages for distinct long-term personal injuries and conditions arising from childhood sexual abuse by a pedophile Roman Catholic priest. The injuries were timely discovered and are within the governing Vermont statutes of limitations under choice of laws rules. Plaintiff at ages 15 and 16 was the victim of sexual crimes committed in Vermont by defendant Rev. Edward Smith, a priest. Smith was authorized to perform sacerdotal functions by the defendant Roman Catholic Diocese of Wilmington and he also was the campus minister at Archmere Academy responsible for spiritual and personal counseling, the conduct of religious services, days of spiritual recollection, and the administration of sacraments.

Smith was so employed despite the fact that he was a known sexual predator with a history of such sexual crimes in Philadelphia, Pennsylvania prior to his assignment in Delaware.

## I.  JURISDICTION

2.  The diversity jurisdiction of this court is invoked pursuant to 28 U.S.C. §§ 1332, 2201 and 2202.  This case arises between citizens of different States and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

3.  Venue is appropriate pursuant to 28 U.S.C. § 1391(a)(1), because all defendants reside in this judicial district.

4.  Under choice of law rules, the place where the complained of injuries occurred is the State of Vermont.  The place where the conduct causing the injury occurred also is Vermont.  The criminal laws which were violated are those of Vermont.

5.  The domicile, residence and citizenship of plaintiff is not in the State of Delaware.  There is no place or state where any present relationship exists between the parties.

6.  Vermont is the State which has the most significant relationship between the parties.  No other state has a more significant relationship to the occurrence, the injuries and the parties.

## II.   THE PARTIES

7.   Plaintiff, is currently a resident of Quantico, Virginia where he serves as an officer in the United States Navy.  He is a citizen of the State of Florida. During high school plaintiff resided in Glen Mills, Pennsylvania and he was not a resident of Delaware.

8.   Plaintiff is presently 37 years old and he was born on March 1, 1968.  When he was the victim of childhood sexual abuse in Vermont, he was a minor, 15 and 16 years of age.

9.   Defendant Archmere Academy, Inc. ("Archmere") is a Delaware corporation (file number 0315606), organized under Title 8 of the Delaware General Corporation Law and not Title 27. It is authorized to do business and it is doing business in the State of Delaware as a private religious high school located in Claymont, Delaware.  It is sued in its corporate capacity and as agent of the Catholic Diocese of Wilmington, Inc.  Its registered agent is YCST Services, LLC, 1000 West Street, Brandywine Bldg., 17th Floor, Wilmington, DE 19801.

10.   Archmere was responsible for hiring and supervising defendant Rev. Edward Smith who was at all times its employee.

11.   Defendant Catholic Diocese of Wilmington, Inc. ("Diocese") is a Delaware corporation (file number 0787107) organized under Title 8 of the Delaware General Corporation Law, and not Title 27. It is authorized to do business and is doing

-3-

business in the State of Delaware as a Roman Catholic religious
enterprise.   It serves as its own registered agent at 1626 N.
Union St., Wilmington, DE 19806.

12.   Diocese was responsible at all times for licensing
defendant Smith to perform priestly functions.   Without the
explicit authorization and sanction of Diocese, he could not have
performed priestly functions of spiritual and personal
counseling, the conduct of religious services, days of spiritual
recollection, and the administration of Roman Catholic
sacraments.

13.   Defendant Rev. Edward Smith ("Smith") is a Roman
Catholic priest and a member a religious order of priests which
staffs Archmere's high school, known as the Norbertines.   The
Norbertines is headquartered in De Pere, Wisconsin.   From 1982
through the present he has served as a priest within the Diocese.
He is presently in his late 50s or early 60s in age.   His present
address is Immaculate Conception Priory, 1269 Bayview Road,
Middletown, DE 19709.   He is a citizen of Delaware.   He is sued
in his official and individual capacities.

14.   Defendant Rev. Michael A. Saltarelli ("Saltarelli") is
currently employed as the Roman Catholic Bishop of the Diocese.
He is sued only in his official capacity as agent or alter ego of
the Diocese for purposes of collecting a money judgment against
the Diocese, should its assets be titled in his name.   He is a

citizen of Delaware.

15.   Throughout the facts alleged herein, defendants Archmere and Diocese had actual or constructive knowledge of prior criminal conduct by defendant Smith where he sexually abused young boys.  This conduct culminated in 1980 and occurred in the Philadelphia, Pennsylvania vicinity, at places like St. John Neumann High School in South Philadelphia.

16.   They also had actual or constructive knowledge of the childhood sexual abuse Smith committed upon plaintiff.

17.   Smith's misconduct also was authorized, sanctioned, ratified, acquiesced in or approved by those defendants.  All his acts were taken within the scope of his authority and for the benefit of those defendants.

### III.   THE FACTS

#### A.   Plaintiff's Background

18.   Plaintiff has honorably served as a Medical Officer in the United States Navy for eleven years.

19.   He has attained the rank of Lieutenant Commander and earned his Navy Wings of Gold.

20.   Plaintiff has served as a Naval pilot and as a flight surgeon.

21.   He is presently a Naval Medical Officer and a designated Naval Aerospace Optometrist serving as a health care administrator in Quantico, Virginia.

22. Plaintiff's military assignments in the United States Navy include the Naval submarine Base in Groton, Connecticut; the Naval Recruiting District in New York City; Aberdeen Proving Ground, in Aberdeen, Maryland; the Naval Air Station, in Pensacola, Florida; and presently the Marine Corps Base, in Quantico, Virginia, where he has been stationed since May 2005.

23. Plaintiff is the recipient of the Meritorious Service Medal, the Navy Commendation Medal (three times), the Army Commendation Medal, the Navy Achievement Medal (three times), the Army Achievement Medal, and the military Outstanding Volunteer medal.

24. Plaintiff obtained his Optometry degree, *with distinction*, in 1994 from Pacific University College of Optometry. He graduated *magna cum laude* in 1990 from Villanova University, in Villanova, Pennsylvania, majoring in Biology, Chemistry and Mathematics.

## B. Smith's Pennsylvania Sexual Crimes

25. Because of sexual misconduct, sometime in 1980 Smith was removed by his religious superiors in the Norbertines as the principal of the South Philadelphia, PA High School named St. John Newmann. Previously he had served as the dean of student life there.

26. The media on May 21, 2002 reported that Smith is accused of twice sexually molesting a 13 year old student there

-6-

in 1979, in Smith's faculty dormitory and in a school conference
room.

27.   Smith also reportedly sexually abused two other young
boys at that time.

28.   His religious superiors then hid Smith in Maryland for
two years until things quieted down.   He retained all his
priestly powers while he was hidden in Maryland.

29.   Next Smith was transferred to Archmere in 1982 where he
exercised full powers as both a priest and as a teacher of
religion and English.

**C. The Vermont Childhood Sexual Abuse and Vermont Crimes**

30.   Plaintiff was a student at Archmere Academy from 1982
until May of 1986, when he graduated.

31.   Plaintiff was raised in a devout Roman Catholic family.
He attended Roman Catholic elementary and high school.   He
regularly attended Mass and received the sacraments of that
Church.   He participated in many Church related activities.   He
was an altar boy for several years as well.

32.   As a licensed priest and campus minister, Smith was a
person of great influence and persuasion.   He was revered as an
authority figure and as a purported holy man.

33.   Smith was the campus minister and also a religion and
English teacher for plaintiff at Archmere.

34.   Smith is independently wealthy and he always has lived

-7-

a lavish lifestyle, for example, by wearing a gold/diamond studded watch and jewelry.

35.  He also owned his own private automobile and he always carried  large amounts of cash, which he used to pay for gifts, meals, etc.

36.  To encourage plaintiff to go away with him to Vermont, Smith gave him many, many gifts and flashed a large pocketful of $20 bills.  He also let plaintiff drive his late model car repeatedly before plaintiff was 16 years of age.  He also encouraged plaintiff to consume alcohol while he was around Smith.

37.  During plaintiff's sophomore and junior years in high school, in February or March of 1984 and 1985, Smith took plaintiff and another former student from Philadelphia on ski trips to Killington, Vermont over the weekend.  Smith drove his Mercury Cougar automobile on these occasions.

38.  Smith roomed on Friday and Saturday nights on each occasion with plaintiff and placed the other former student in a separate room for those nights.  They all returned from Vermont on late Sunday night on each occasion.  They stayed in different hotels in Vermont each year.

39.  On each of those four nights Smith sexually molested plaintiff and committed various sexual crimes on him, which included Lewd or Lascivious Conduct with Child or someone under

-8-

age 16, in violation of 13 V.S.A. sections 2601 and 2602 (1984);

Sexual Assault, in violation of 13 V.S.A. sec. 3252 (1984); or

Aggravated Sexual Assault, in violation of 13 V.S.A. sec. 3253

(1984). These crimes carried penalties of from five to 20 to 25

years incarceration.

40. Plaintiff then suffered certain distinct immediate

injuries. He also suffered certain distinct long term injuries

and conditions which are recognized under Vermont law.

## D. Discovery of the Causal Connection Between Long Term Injuries and Childhood Sexual Abuse

41. The Vermont legislature and its courts recognize that

survivors of childhood sexual abuse have difficulty connecting

their abuse and the psychological illnesses that may surface many

years later.

42. Plaintiff had similar difficulty connecting the

psychological effects of his childhood sexual abuse because these

traumatic events disrupted his memory function and cognition.

43. It was not until the spring of 2003 when plaintiff

discovered through his treating psychiatrist that there was a

causal connection between the defendants' acts in 1984 and 1985

and various distinct and separate long term emotional and

psychiatric injuries or conditions for which plaintiff presently

seeks relief.

44. Until the spring of 2003 plaintiff did not have actual

knowledge of this causal connection between distinct and separate

-9-

long term emotional and psychiatric injuries and the childhood
sexual abuse he experienced in Vermont as a result of the actions
of the defendants.

45. This connection was inherently unknowable until that
date. Plaintiff was blamelessly ignorant of that causal
connection.

46. Plaintiff also suffered from various forms of traumatic
amnesia. Since at least 1992 or earlier he suppressed all or
part of these sexual assaults and memories, pretending that they
did not exist and he buried them deep within his psyche. Since
1992 plaintiff also may not have understood or remembered all or
part of the various aspects of these crimes.

47. Plaintiff did not fully understand or remember that he
had been the victim of the sexual assaults in Vermont until
approximately the spring of 2003.

### E.  Smith's Recent Admission of Wrongdoing

48. In late 2004 plaintiff confronted Smith and his
Norbertine religious superiors. Smith then admitted his
wrongdoing in the presence of others. Smith admitted the
childhood sexual abuse which he had committed on plaintiff.

### F.  Causation

49. The actions of the defendants have been the proximate
cause of separate and distinct long term injuries and conditions
which plaintiff suffered. The actions of each defendant played a

-10-

role in the childhood sexual abuse committed on plaintiff. Such
abuse was a foreseeable consequence of the negligence of the
defendants. It was a substantial or motivating factor in
plaintiff's injuries.

## G. Injuries

50. Because of the childhood sexual abuse plaintiff
suffered at the hands of Smith, after high school plaintiff
always had struggles in forming successful relationships with
women. For example, plaintiff struggled with severe lack of
confidence and self esteem issues.

51. Plaintiff proceeded with due diligence in his attempts
to determine the nature and cause of any injuries or conditions
he was experiencing. He first started counseling in 1992, but no
connection was discovered at that time between his childhood
sexual abuse and any long term injury or condition.

52. Plaintiff married in 1997.

53. Immediately after his marriage, difficulties arose in
his relationship with his wife and plaintiff had to undergo
further counseling to try to determine the nature and cause of
any injuries or conditions he was experiencing.

54. Again, no connection was discovered between his
childhood sexual abuse and any long term injury or condition he
was experiencing.

55. At the height of one heated argument with his wife in

-11-

early 2000, plaintiff's wife screamed "what happened to you to make you treat me this way!"  Plaintiff then for the first time thought to tell her about his past childhood sexual abuse.

56.  The birth of two children then followed in late 2000 and early 2002.

57.  In the spring of 2003 plaintiff started therapy again and related his childhood sexual abuse up front and his various emotional and physical difficulties.  Then for the first time a therapist stated that his childhood sexual abuse had distinct long term negative repercussions in his life.

58.  Since that time plaintiff and his wife have worked painstakingly at plaintiff's slow rehabilitation and the rehabilitation of their marriage and family.

59.  The separate and distinct long term injuries and conditions which plaintiff in 2003 first discovered were the result of his childhood sexual abuse, include but are not limited to: sexual dysfunction, lack of marital intimacy, guilt, emotional pain, anger, loss of enjoyment of life, embarrassment, and other temporary or permanent personal injury.

## H.  Agency Relationships

60.  Under Vermont law, Archmere and Diocese are legally responsible for the childhood sexual abuse which plaintiff suffered.  Vermont law does not require either of them to have been the actual perpetrators of the childhood sexual abuse upon

-12-

plaintiff to be held legally liable.  Instead, their actions only have to have played a substantial or motivating role in the sexual abuse for either defendant to be held legally liable.

61.  Smith was at all times an employee of Archmere which was responsible for his hiring and for supervising him.

62.  Smith was at all times a licensed priest of Diocese which was responsible for licensing him and for supervising him.

63.  At all times relevant hereto defendant Smith also was a priest licensed by the defendant Diocese to operate in the schools, homes, hospitals, parishes, and churches of the Diocese. Without Roman Catholic Church and Diocesan approval he could perform no sacerdotal functions or function as a priest or campus minister in any manner whatsoever at Archmere or anywhere in Delaware.

64.  At all times and in all matters relevant hereto, defendant Smith was the agent of defendants Diocese and Archmere, who were his principal.  These defendants manifested an intention that defendant Smith become their agent and act on their behalf. Smith accepted and consented to serve and act on their behalf as their agent.  Smith consented to be subject to their control.

65.  They gave Smith the power to act on their behalf and to produce changes in legal relations by performing or not performing legal acts.  They conferred upon Smith the authority (express, implied, apparent or inherent) to affect their legal

relations by performing acts in accordance with their
manifestations of consent. At all times, Smith acted within the
scope of that consent.

66. All acts, if any, initially done outside the scope of
that consent were ratified, sanctioned, approved, affirmed,
adopted or acquiesced in by Diocese and Archmere. Such acts were
enabled by the agency relationship.

67. At all times and in all matters relevant hereto,
Archmere and Smith were agents of Diocese. They were empowered
by Diocese to perform religious and educational duties and
functions undertaken on behalf of Diocese. They accepted and
consented to serve and act on Diocese's behalf as its agents.

68. Diocese gave them the power to act on its behalf and to
produce changes in legal relations by performing or not
performing legal acts. Diocese conferred upon them the authority
(express, implied, apparent or inherent) to affect the legal
relations of Diocese by performing acts in accordance with
Diocese's manifestations of consent. At all times, they acted
within the scope of that consent.

69. All acts, if any, initially done outside the scope of
that consent were ratified, sanctioned, approved, affirmed,
adopted or acquiesced in by Diocese. Such acts were enabled by
the agency relationship.

70. Smith's actions were of the kind Archmere and Diocese
expected him to perform. His conduct was not unexpected by

-14-

Archmere and Diocese. His actions occurred substantially within the authorized time and space limits placed upon him by Archmere and Diocese. Smith was actuated at least in part by a purpose to serve Archmere and Diocese.

71.   Archmere and Diocese also were negligent or reckless in their supervision of Smith.   They knew or should have known about his misconduct and failed to stop it.

72.   Smith was aided in accomplishing the torts committed upon plaintiff by the existence of his agency relation with Archmere and Diocese.

## I.   Fiduciary Duties

73.   Fiduciary relationships and duties also existed between plaintiff on the one hand, and Smith, Archmere and Diocese on the other.   These relationships are characterized by the highest degree of trust, confidence, good faith, honesty and candor, as well as a prohibition against self-dealing.

74.   Similar or identical to the fiduciary relationships and duties that characterize the lawyer-client, doctor-patient and clergyman-church member relationships, such special relationships also existed in this case between plaintiff and his parents (who were members of the Roman Catholic Church and religion and faithful adherents to its doctrines, rituals, hierarchical organization and precepts), and Smith, Archmere and Diocese.

75.   This special fiduciary relationship was formed due to

-15-

defendants' positions of the highest trust and spiritual authority as high ranking members or entities of the Roman Catholic religion to which plaintiff and his parents were adherents.  The fiduciary relationship was formed when plaintiff and his parents placed trust in the faithful integrity of defendants and their agents as religious authorities and leaders.

76.  As a result of placing this trust, defendants gained influence, superiority and assumed religious control and responsibility over plaintiff.

77.  Both Archmere and Diocese had the ability to control Smith's conduct. The danger of Smith molesting children coming to him for spiritual care was reasonably foreseeable.  But Archmere and Diocese breached their fiduciary duty to plaintiff by allowing Smith to function as a priest, campus minister and educator.

## COUNT I - Assault, Battery and Childhood Sexual Abuse (Vermont Torts)

78.  Plaintiff repeats and realleges paragraphs 1-77 set forth above.

79.  Under 12 Vermont Statutes Annotated, § 522 (2004) --

(a) A civil action brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within six years of the act alleged to have caused the injury or condition, or six years of the time the victim discovered that the injury or condition was caused by that act, whichever period expires later.  The victim need not establish which act in a series of

-16-

continuing sexual abuse or exploitation incidents caused the
injury.

80.   Vermont law provides that the statute of limitations is
tolled until a victim of childhood sexual abuse in fact discovers
the causal connection between the defendant's act and the long
term distinct injuries for which the claim is brought.   Earle
v. State, 743 A.2d 1101, 1106-1107 (Vt. 1999).

81.   In the spring of 2003 plaintiff first discovered that
there was a causal connection between defendants' acts of
childhood sexual abuse in 1984 and 1985 and the injuries for
which this action is brought. This connection was inherently
unknowable until that date.  Plaintiff was blamelessly ignorant
of the causal connection.

82.   In Vermont, Smith by gesture or threat of violence
exhibited an intention to assault plaintiff.  In Vermont Smith
intentionally and without plaintiff's consent caused plaintiff
repeatedly to be in fear of immediate harmful or offensive
physical contacts by Smith.

83.   In Vermont, Smith had the means of carrying that
gesture or threat into effect.

84.   In Vermont, Smith committed the intentional tort of
civil assault under Vermont law.

85.   In Vermont, Smith intended to cause harmful or
offensive contact with plaintiff, or the imminent apprehension of
such a contact.  In Vermont, Smith intentionally and without

-17-

plaintiff's consent repeatedly made unpermitted physical contact
with plaintiff in a harmful and offensive way.

86.   These contacts would offend an ordinary person's
reasonable sense of personal dignity, and it repeatedly offended
plaintiff.

87.   In Vermont, such a harmful or offensive contact
directly or indirectly resulted from Smith's actions.

88.   In Vermont, Smith committed the intentional tort of
battery under Vermont law.

89.   Vermont law on assault and battery seeks to regulate
actions and not beliefs in a uniform and non-discriminatory
manner. These are laws of general applicability.

90.   The actions of each of the defendants were willful,
malicious and oppressive.   They demonstrated a callous, reckless
or wanton disregard of the rights of plaintiff, then a minor
child.

91.   Plaintiff's right to be free of assault and battery and
childhood sexual abuse has been denied by each of the defendants
under the common and statutory law of the State of Vermont.

## COUNT II - Intentional Infliction of Emotional Distress (Vermont Tort)

92.   Plaintiff repeats and realleges paragraphs 1-91 set
forth above.

93.   In Vermont, the conduct of Smith was outrageous.

94.   His conduct went beyond all possible bounds of decent

and tolerable conduct in a civilized community.  It was atrocious
and utterly intolerable.

95.  Smith acted intentionally or with reckless disregard to
the probability of causing emotional distress.

96.  His actions resulted in plaintiff suffering extreme
emotional distress.

97.  Plaintiff's injuries were proximately caused by the
outrageous conduct of Smith.

98.  The actions of each of the defendants were willful,
malicious and oppressive.  They demonstrated a callous, reckless
or wanton disregard of the rights of plaintiff, then a minor
child.

99.  Plaintiff's right to be free of intentional infliction
of emotional distress has been denied by each of the defendants
under the common and statutory law of the State of Vermont.

## COUNT III - Negligence and Breach of Fiduciary Duty

### (Vermont Tort)

100.  Plaintiff repeats and realleges paragraphs 1-99 set
forth above.

101.  Under Vermont case law, negligence claims for failing
to prevent childhood sexual abuse incorporate the statute of
limitations found in 12 V.S.A. § 522.  State v. Earle, 743 A.2d
at 1105.

102.  In the spring of 2003 plaintiff first understood that

-19-

he had been the victim of childhood sexual abuse which caused distinct long term injuries and conditions.  This was inherently unknowable until that date.  Plaintiff was blamelessly ignorant of this fact.

103.  Archmere and Diocese owed various duties to plaintiff. They breached these duties.   These breaches proximately caused injury to plaintiff.

104.  For example, in 1982 Diocese and Archmere failed in their duty under Vermont law to do appropriate background checks and screening on Smith to determine if Smith was a pedophile or had sexually molested students previously.  They did not exercise reasonable care in their selection of Smith.

105.  The Restatement (Second) of Agency, section 213, imposes liability upon Archmere if its conduct was negligent or reckless "in the employment" of Smith since his work "involv[ed] risk of harm to others."  Any reasonable background check or pre-employment screening of Smith would have revealed that he was a sexual predator who previously committed such crimes in Philadelphia.

106.  Second, both corporate defendants also failed in their common law duty to supervise Smith to determine if he could relate to children appropriately.

107.  Under section 213 of the Restatement, Archmere is also liable if it was negligent "in the supervision" of Smith.  Any

-20-

reasonable oversight of Smith would have revealed that he was plying young boys with money, liquor and cars to satisfy his lusts.

108.  Diocese is also liable under section 213 of the Restatement if it was negligent "in the supervision" of Smith. Any reasonable oversight of Smith would have revealed that he was plying young boys with money, liquor and cars to satisfy his lusts.

109.  Both corporate defendants did not want to know if he was a risk to students and consciously decided not to pursue any policy which would have uncovered the risks posed by Smith.

110.  Upon his transfer to Archmere, all the other priests on the staff had to have known about the past allegations of sexual misconduct by Smith in Philadelphia and why he was no longer working in Philadelphia.

111.  They and the administrators at Archmere should have been on heightened alert to his forming close personal relationships with young boys and he should not have been placed in the position of campus minister responsible for the spiritual and personal counseling of young boys.

112.  Employees or agents of both corporate defendants had actual personal knowledge that Smith had previously engaged in sexual misconduct.  But they took no appropriate action based on that information.

-21-

113.   Diocese and Archmere also had actual or constructive knowledge that Smith was sexually molesting young male minors. But they took no remedial action.

114.   Third, Archmere and Diocese also had a fiduciary duty under Vermont common law, arising from the licensing of Smith to operate as a priest, to ensure that he did not pose a risk of sexually molesting male minors when he operated as a priest, campus minister, confidant, counselor or teacher in schools.

115.   In 1982 Archmere also had a fiduciary duty to employ a priest as a campus minister who would not commit sexual crimes on a student.   Archmere knew or should have known Smith was a sexual predator.   Archmere breached this duty and plaintiff was injured.

116.   Archmere also had the fiduciary duty to use reasonable care to avoid harm to plaintiff by Smith.

117.   Concerning Diocese, in 1982 it also had a fiduciary duty not to license a priest to operate within its territory and perform sacerdotal functions, such as operating as a campus minister or administering Roman Catholic sacraments, who would not commit sexual crimes on a Roman Catholic church member. Diocese knew or should have known that Smith was a sexual predator.   Diocese breached this duty and plaintiff was injured.

118.   Diocese also had the fiduciary duty to use reasonable care to avoid harm to plaintiff by Smith.

119.   Vermont law in this regard seeks to regulate actions

-22-

and not beliefs in a uniform and non-discriminatory manner. These are laws of general applicability.

120.   The actions of Archmere and Diocese were willful, malicious and oppressive.   They demonstrated a callous, reckless or wanton disregard of the rights of plaintiff, then a minor child.

121.   Plaintiff's rights have been denied by each of the corporate defendants under the common and statutory law of the State of Vermont.

**WHEREFORE**, plaintiff prays that the Court:

(a)   Enter judgment against the defendants, jointly and severally.

(b)   Enter a judgment against the defendants, jointly and severally, for compensatory and punitive damages.

( c)   Enter a judgment against defendants, jointly and severally, for costs and pre and post judgment interest and attorneys' fees.

(d)   Require such other and further relief as the Court deems just and proper under the circumstances.

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQUIRE (#243)**
**STEPHEN J. NEUBERGER, ESQUIRE (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Attorneys for Plaintiff

Dated: November 17, 2005
WHITWELL/Pleading/Complaint FINAL

-23-