## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **Lt. Commander KENNETH J. WHITWELL,** | : | |
| **U.S. Navy,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **C.A.No.05-796-SLR** |
| **ARCHMERE ACADEMY, INC., a Delaware** | : | |
| **corporation; CATHOLIC DIOCESE OF** | : | |
| **WILMINGTON, INC., a Delaware corporation;** | : | |
| **Rev. EDWARD SMITH, individually and in his** | : | |
| **official capacity; and Rev. MICHAEL A.** | : | |
| **SALTARELLI, in his official capacity,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFF'S JOINT ANSWERING BRIEF IN OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

THE NEUBERGER FIRM, P.A.
THOMAS S. NEUBERGER, ESQ. (#243)
STEPHEN J. NEUBERGER, ESQ. (#4440)
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Dated: September 22, 2006          Attorneys for Plaintiff

# TABLE OF CONTENTS

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.     Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.     Smith Previously Committed Similar Sexual Crimes in Pennsylvania . . . . . . . . . 4

      C.     Smith's Subsequent Transfer to Archmere and the Wilmington Diocese . . . . . . 5

      D.     Smith's Authoritative and Religious Influence Over Plaintiff . . . . . . . . . . . . . . . 5

      E.     The Ski Trips to Vermont Where Smith Subjected Plaintiff to Horrific Crimes of Sexual Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      F.     Plaintiff's Life After Archmere . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      G.     Plaintiff's Spring of 2003 Discovery of the Causal Connection between Defendant's Sexual Abuse and his Injuries . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      H.     Smith's 2004 Admission of Wrongdoing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      I.     Smith Acted at all Times as an Agent of Archmere and Diocese . . . . . . . . . . . . 9

      J.     Archmere and Smith Acted at All Times as Agents of Diocese . . . . . . . . . . . . . 9

      K.     Archmere and Diocese were Negligent in Their Hiring, Supervision and Licensing of Smith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      L.     Archmere and Diocese Also Breached Their Fiduciary Duties to Plaintiff and His Parents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      M.     The Damages Plaintiff Sustained as a Result of Smith's Childhood Sexual Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      I.     Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      II.     Under Delaware's Choice of Law Principles Vermont's Statute of Limitations Applies to this Cause of Action Making the Filing of the Complaint Timely Under Vermont Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

A.    The Guiding Principles Embodied in Delaware's Borrowing Statute
Weigh in Favor of Applying Vermont's Statute of Limitations  . . . . . . . 14

B.    The Restatement (Second) Conflicts of Laws § 142, as Modified by
the Delaware General Assembly, Also Points to Vermont's Statute of
Limitations as Controlling . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C.    Plaintiff's Cause of Action is Timely Under Vermont's Statute of
Limitations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

III.    Under Delaware's Choice of Law Doctrine, Vermont has the Most Significant
Relationship to Plaintiff's Cause of Action and Therefore, Vermont Law
Applies to this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A.    Section 145 Determines the Relevant Contacts to be Taken into
Consideration . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

(a)    The Place Where the Injury Occurred  . . . . . . . . . . . . . . . . . . . 21

(b)    The Place Where the Conduct Causing the Injury Occurred  . . . . 23

(c)    The Domicile, Residence, Nationality, Place of Incorporation
and Place of Business of the Parties . . . . . . . . . . . . . . . . . . . . . . 23

(d)    The Place Where the Relationship, if any, Between the Parties
is Centered  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

B.    Section 146's Presumption that the State of Injury Controls is Only
Overcome by Showing Another State has a More Significant Interest  . . 25

C.    Section 6 Principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

(a)    The Needs of the Interstate and International Systems  . . . . . . . 25

(b)    The Relevant Policies of the Forum . . . . . . . . . . . . . . . . . . . . . . 26

(c)    The Relevant Policies of Other Interested States and the
Relative Interests of Those States in the Determination of the
Particular Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

(d)    The Protection of Justified Expectations  . . . . . . . . . . . . . . . . . . 28

(e)    The Basic Policies Underlying the Particular Field of Law . . . . . 28

(f)    Certainty, Predictability and Uniformity of Result  . . . . . . . . . . 30

*ii*

(g)    Ease in the Determination and Application of the Law to be
Applied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D.    Consequently Vermont is the State with the Most Significant
Relationship . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IV.    Saltarelli is a Proper Defendant Because He is Sued in his Official Capacity
as the Agent or Alter-Ego of the Diocese  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

V.    Saltarelli is a Proper Official Capacity Defendant for Purposes of Exectuting
Judgment Against Diocese Should the Diocese's Assets be Held in Saltarelli's
Name  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page**

B. Lewis Productions, Inc. v. Bean, 2005 WL 273298 (D.Del. Jan. 28, 2005) . . . . . . . . . . 14-16

Barquin v. Roman Catholic Diocese of Burlington, Vermont, Inc.,
    839 F.Supp. 275 (D.Vt. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Camden County Board of Chosen Freeholders v. Beretta, U.S.A. Corp.,
    273 F.3d 536 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Conley v. Gibson, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

D.P. Enterprises, Inc. v. Bucks County Comty. College, 725 F.2d 943 (3d Cir. 1984) . . . . . . . 12

Delargy by Delargy v. Hartford Accident and Indemnity Co.,
    1986 WL 11562 (Del.Super. Oct. 8,1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Dymond v. NBC, Inc., 559 F.Supp. 734 (D.Del. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

Earle v. State, 743 A.2d 1101 (Vt. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Eden v. Oblates of St. Francis de Sales, et al., C.A. No. 04C-01-069 CLS (Del.Super.) . . . . . . 33

Elmer v. Tenneco Resins, Inc., 698 F.Supp. 535 (D.Del. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 17

Emerson v. Thiel College, 296 F.3d 184 (3d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Evancho v. Fisher, 423 F.3d 347 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Garcia v. Nekarda, 1993 WL 54491 (Del.Super. Feb. 19, 1993) . . . . . . . . . . . . . . . . . . . . . . . 26

Gavura v. Pennsylvania State House of Representatives, 55 Fed.Appx. 60 (3d Cir. 2002) . . . . 33

Hartz v. Diocese of Greensburg, 94 Fed.Appx. 52 (3d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 16

Hurtt v. McElroy, 1984 WL 553559 (Del.Super. Mar. 30, 1984) . . . . . . . . . . . . . . . . . . . . . . 18

In re Nationwide Mut. Ins. Co. v. Wooters, 1996 WL 280778 (Del.Super. Jan. 31, 1996) . . . . . 30

Ison v. E.I. DuPont de Nemours and Co., Inc., 729 A.2d 832 (Del. 1999) . . . . . . . . . . . . . . . . 22

Jackson v. Phillips, 1999 WL 463524 (Del.Super. Apr. 6, 1999) . . . . . . . . . . . . . . . . . . 27, 29, 31

Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250 (3d Cir. 1994) . . . . . . . . . . . . . . 13

Judge Trucking Co. Inc. v. Estate of Cooper,
     1994 WL 680029 (Del.Super. Sept. 19, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-31

Juran v. Bron, 2000 WL 1521478 (Del.Ch. Oct. 6, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Kellam v. McDevitt & Street Co., 1994 WL 319123 (Del.Super. Jun. 23, 1994) . . . . . . 21, 25, 30

Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487 (1941) . . . . . . . . . . . . . . . . . . . . . . . 14

Kubasko v. Pfizer, 2000 WL 1211219 (Del.Super. Jun. 30, 2000) . . . . . . . . . . . . . . . . . . . . 20-21

Kulwicki v. Dawson, 969 F.2d 1454 (3d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,
     507 U.S. 163 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

McBride v. Whiting-Turner Contracting Co.,
     1993 WL 489487 (Del.Super. Oct. 21, 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31

NL Industries, Inc. v. Commercial Union Ins. Co., 65 F.3d 314 (3d Cir. 1995) . . . . . . . . . 28, 30

Pack v. Beech Aircraft Corporation, 132 A.2d 54 (Del. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . 18

Pittman v. Maldania, Inc., 2001 WL 1221704 (Del.Super. July 31, 2001) . . . . . . . . . . . . . . . . 24

Prudential Property and Cas. Ins. Co. v. Pendleton, 858 F.2d 930 (3d Cir. 1988) . . . . . . . . . . 17

Railroad Telegraphers v. R.Y. Express Agency, 321 U.S. 342 (1944) . . . . . . . . . . . . . . . . . . . 26

Rasmussen v. Uniroyal Goodrich Tire Co.,
     1995 WL 945556 (Del.Super. Aug. 18, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

Reyes v. Kent General Hosp., Inc., 487 A.2d 1142 (Del. 1984) . . . . . . . . . . . . . . . . . . . . . . . . 26

Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co., Inc., et al.,
     866 A.2d 1 (Del. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-17

Swierkiewicz v. Sorema N. A., 534 U.S. 506 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13-14, 33

Thomas v. Sanford, 2000 WL 1211136 (Del.Super. Jan. 11, 2000) . . . . . . . . . . . . . . . . . . . . . . 20

Thompson v. Reinco, Inc., 2004 WL 1426971 (Del.Super. June 15, 2004) . . . . . . . . . . . . . . . . 22

Travelers Indemnity Co. v. Lake, 594 A.2d 38 (Del. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 19-21

**Statutes, Rules and Other Authorities**

10 Del.C. § 8119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

10 Del.C. § 8121 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 18

12 V.S.A. § 512(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

12 V.S.A. § 512(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

12 V.S.A. § 512(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

12 V.S.A. § 512(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

12 V.S.A. § 522 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18-19, 26-27

13 V.S.A. § 2601 (historical Vermont statute dated 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 6

13 V.S.A. § 2602 (historical Vermont statute dated 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 6

13 V.S.A. §3252 (historical Vermont statute dated 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 6

13 V.S.A. §3253 (historical Vermont statute dated 1984) . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed.R.Civ.P. 5(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Fed.R.Civ.P. 8(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 33

Fed.R.Civ.P. 8(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed.R.Civ.P. 8(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Fed.R.Civ.P. 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12-13, 34

Fed.R.Civ.P. 55(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed.R.Civ.P. 55(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Restatement (Second) Conflicts of Law § 6 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Restatement (Second) Conflicts of Laws § 6 cmt. d (1971) . . . . . . . . . . . . . . . . . . . . . . . . 25

Restatement (Second) Conflicts of Laws § 6 cmt. e (1971) . . . . . . . . . . . . . . . . . . . . . . . . 27

Restatement (Second) Conflicts of Laws § 6 cmt. f (1971) . . . . . . . . . . . . . . . . . . . . . . . . 28

*vi*

Restatement (Second) Conflicts of Laws § 6 cmt. g (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Restatement (Second) Conflicts of Laws § 6 cmt. h (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Restatement (Second) Conflicts of Laws § 6 cmt. j (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Restatement (Second) Conflicts of Laws § 118 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Restatement (Second) Conflicts of Laws § 142 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 17-18

Restatement (Second) Conflicts of Laws § 145 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . 19-21, 31

Restatement (Second) Conflicts of Laws § 145(1) (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Restatement (Second) Conflicts of Laws § 145(2) (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Restatement (Second) Conflicts of Laws § 145 cmt. c (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Restatement (Second) Conflicts of Laws § 145 cmt. e (1971) . . . . . . . . . . . . . . . . . . . . . . . 21-24

Restatement (Second) Conflicts of Laws § 145 cmt. f (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Restatement (Second) Conflicts of Laws § 146 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . 3, 21, 25, 31

## NATURE AND STAGE OF THE PROCEEDING

This is a diversity case for money damages for distinct long-term personal injuries and conditions arising from childhood sexual abuse by a pedophile Roman Catholic priest, Rev. Edward Smith ("Smith").  Plaintiff, Lt. Commander Kenneth J. Whitwell, U.S. Navy, filed this action on November 17, 2005 naming as defendants Archmere Academy, Inc., ("Archmere"), the Catholic Diocese of Wilmington, Inc. ("Diocese"), Rev. Michael A. Saltarelli, in his official capacity only ("Saltarelli"), and Smith.

Service on defendant Smith was achieved on January 3, 2006.  (See D.I. 5). Under Fed.R.Civ.P. 12(a)(1)(A), Smith's Answer was due on January 23, 2006.  In mid-January, the undersigned counsel was telephonically contacted by a Tom Burgstrum who indicated that he was defendant Smith's personal attorney.  Upon request, a 30 day extension of time to Answer the Complaint was orally granted to Smith.  Accordingly, Smith's Answer was due on February 23, 2006.  However, despite the granting of this oral extension and the passage of more than eight months since service was executed, defendant Smith to date has failed to file either an Answer or any other responsive pleading.

Accordingly, about six weeks later, on April 10, 2006 plaintiff filed his Rule 55(b) Motion for a Default Judgment Against Defendant Smith and for a Trial on Damages. (D.I. 10).  Fed.R.Civ.P. 55(a) states that "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules and that fact is made to appear by affidavit or otherwise, the clerk shall enter the party's default." Fed.R.Civ.P. 55(a).  On April 18, 2006, the Court then issued a notice of deficiency stating that plaintiff's request for a default judgment had not been properly

1

served upon Smith.  In response to this notice, after consulting with the Court's staff, plaintiff submitted a letter to the Court citing legal authority for the proposition that a party filing a default judgment motion for failure to appear need not serve such a pleading upon the defaulting party.  See Fed.R.Civ.P. 5(a) ("No service need be made on parties in default for failure to appear ...") (See D.I. 13).  The Court has not yet ruled on plaintiff's pending motion for a default judgment, and he respectfully requests that it be decided to provide him some modicum of relief for the wrongs he has suffered.

Pursuant to this Court's March 29, 2006 Stipulated Briefing Schedule, on March 27, 2006, each defendant filed a Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6) only. (D.I. 6, 7, and 8).  Subsequently on June 23, 2006, each defendant filed their Opening Briefs in Support of their Motions to Dismiss. (D.I. 14, 15, and 16).

This is Plaintiff's Joint Answering Brief in Opposition to Defendants' Motions to Dismiss.

## SUMMARY OF ARGUMENT

1.  Plaintiff filed his cause of action in a timely manner under Vermont's statute of limitations which affords victims of childhood sexual abuse a more lenient time period in which to file their claim. 12 V.S.A. § 522.  Delaware's borrowing statute is inapplicable to this case since the Delaware Supreme Court has recently explained that the statute is not to be read literally.  Instead, it should be read to further the policy underlying the General Assembly's enactment of it as it was intended to prevent plaintiffs from bringing claims in a Delaware court when the cause of action otherwise would be barred in another state, not from bringing claims in a Delaware Court when the cause of action would be timely in another state.  Further, the Restatement (Second) Conflicts of Laws § 142 states

2

that the forum's statute of limitations will apply only if the forum has not modified this general rule by statute. In adopting the borrowing statute, Delaware chose not to follow the Restatement's general rule and since the borrowing statute is inapplicable, Vermont's statute of limitations applies to this cause of action.

2. Delaware has adopted the Restatement's "most significant relationship" test to determine conflict of law questions. Normally, under § 146 the local law of the place of injury will control absent another state having a more significant interest in the cause of action. In order to determine this, the principles set forth in section 6 of the Restatement must be analyzed and taken into consideration. Under the relevant principles of section 6, Vermont is the state with the most significant relationship to the cause of action because that is where the tortious sexual molestation occurred. Thus, under § 146's presumption the laws of Vermont apply to this cause of action.

3. As the Complaint clearly states, defendant Saltarelli is sued only in his official capacity, not in his individual capacity. Accordingly, the extensive defense recitation of piercing the corporate veil law is unnecessary.

4. Defendant Saltarelli is a proper defendant for purposes of executing judgment against Diocese because the assets of the Diocese are held in his name. Defendants have previously represented and submitted this fact in another court in the State of Delaware. Further, under the notice pleading requirements of Fed.R.Civ.P. 8(c), plaintiff has satisfied his duty of putting defendant on notice of what his claims are and the grounds on which they rest.

## STATEMENT OF FACTS

**A. Introduction.**  Plaintiff is a 38 year old husband and father of two who discovered in 2003 that the sexual abuse he suffered as a minor by his priest, teacher and confidant, was the cause of years of self-confidence issues and relationship problems, as well as short and long term physical and mental injuries. (D.I. 1; Complaint ¶ 42-47). Twice in 1984 and 1985, Smith took advantage of the trust and vulnerability of a teenage boy by taking plaintiff to Vermont on a ski trip and sexually molesting him, forever depriving him of his innocence.  In November of 2005, plaintiff filed this civil lawsuit to protect his claim under Vermont law, as the Vermont legislature and courts recognize that survivors of childhood sexual abuse have difficulty connecting their abuse to the psychological illnesses which may surface years later. (Id. ¶ 41).

**B. Smith Previously Committed Similar Sexual Crimes in Pennsylvania.**

Smith, a member of the Nobertine Order, once served as the dean of student life and principal at St. John Newman, a South Philadelphia, Pennsylvania Catholic high school. (Id. ¶ 9,13,25).  However, in 1980, he was removed from his position as principal by his Norbertine religious superiors because he twice sexually molested a 13 year old student. (Id. ¶ 25-26).  As the media reported on May 21, 2002, Smith was accused of sexually molesting an innocent adolescent boy in his private faculty dormitory as well as in the school conference room. (Id. ¶ 26).  During the same time period, Smith also had taken advantage of and sexually molested two other young boys. (Id. ¶ 27).  Despite these horrific crimes, after being removed from St. John Newman, the Nobertines simply removed him from Pennsylvania and hid Smith in the state of Maryland for two years to allow the uproar to settle down. (Id. ¶ 28).  At no point during these two years in

4

Maryland was Smith stripped of his priestly powers or defrocked. (Id. ¶ 28).

**C. Smith's Subsequent Transfer to Archmere and the Wilmington Diocese.**

In 1982, the Nobertines then brought Smith out of hiding in Maryland and transferred him

to Archmere Academy, a high school in Claymont, Delaware. (Id. ¶ 13,29).  At

Archmere, Smith taught religion and English and also served as the campus minster, each

of which allowed him daily contact with young, innocent boys. (Id. ¶ 7).  When the

Nobertines brought Smith to Archmere, the Wilmington Diocese expressly authorized the

licensing of Smith as a priest and allowed him to perform priestly functions within the

Diocese. (Id. ¶ 12, 29).  Smith was only allowed to fully exercise his priestly powers at

Archmere and in the Diocese because the Diocese had approved his license. (Id. ¶ 29).

By allowing Smith to operate as a teacher at Archmere and also as a Diocesan priest, both

Archmere and Diocese owed plaintiff and his parents duties to protect him from this kind

of misconduct, but miserably failed in doing so. (Id. ¶ 73-77).

**D. Smith's Authoritative and Religious Influence Over Plaintiff.**  Plaintiff

attended Archmere Academy from 1982 until he graduated in May of 1986. (Id. ¶ 30).

Having been raised in a devout Roman Catholic family, he attended both Catholic

elementary and high school. (Id. ¶ 31).  As a devout Catholic, plaintiff regularly attended

Mass, received the sacraments, was an active participant in many Church activities, and

also served as an altar boy for several years. (Id. ¶ 31).  Because of his devout Catholic

upbringing, while attending Archmere, Smith became a person of great influence and

persuasion for plaintiff by virtue of his being a licensed priest and campus minister. (Id. ¶

32).  For plaintiff, Smith stood in the position of an authority figure and purported holy

man, a person he thought he could look up to, admire and trust. (Id. ¶ 32).

Smith was independently wealthy and lived lavishly, a lifestyle most priests renounce. (Id. ¶ 34). He flaunted his money by wearing a gold/diamond studded watch, jewelry, and driving his own private car. (Id. ¶ 34). Smith also carried a large amount of cash which he used to pay for gifts, meals, and other such things. (Id. ¶ 35). In order to entice plaintiff to travel with him to Vermont, Smith bought plaintiff gifts and flashed a large pocketful of $20 bills. (Id. ¶ 36). He also allowed plaintiff to drive his late model car before plaintiff had reached the legal driving age of 16 and also supplied and encouraged plaintiff to consume alcoholic beverages. (Id. ¶ 36-37).

**E. The Ski Trips to Vermont Where Smith Subjected Plaintiff to Horrific Crimes of Sexual Abuse.** In February or March of 1984, while plaintiff was in his sophomore year at Archmere, Smith took plaintiff and a former student on a ski trip to Killington, Vermont. (Id. ¶ 37). This was a three day, two night trip where Smith drove plaintiff and the former student up to Vermont in his Mercury Cougar automobile. (Id. ¶ 37). Smith then roomed with plaintiff on Friday and Saturday nights, while the former student stayed in a separate room. (Id. ¶ 38). The three returned to Philadelphia on Sunday night. (Id. ¶ 38). In February or March of 1985, while plaintiff was in his junior year, Smith also took plaintiff and this same former student on a similar ski trip to Killington, Vermont, except this time they stayed in a different hotel. (Id. ¶ 37-38). Again, Smith stayed in the same room as plaintiff for both nights while the former student slept in a different room. (Id. ¶ 38).

On each of the four nights that Smith stayed with plaintiff in the Vermont hotel rooms, he sexually molested him and committed various sexual crimes on plaintiff. (Id. ¶ 39). Under Vermont law these acts include Lewd or Lascivious Conduct with Child or

someone under age 16, 13 <u>V.S.A.</u> §§ 2601, 2602 (historical Vermont statute dated 1984),

Sexual Assault, 13 <u>V.S.A.</u> §3252 (historical Vermont statute dated 1984), and/or

Aggravated Sexual Assault, 13 <u>V.S.A.</u> §3253 (historical Vermont statute dated 1984). (<u>Id.</u>

¶ 39).  These abovementioned crimes each carried criminal penalties of from five to 20 to

25 years of incarceration. (<u>Id.</u> ¶ 39).  As a result of these sexual crimes committed by

Smith, plaintiff suffered certain distinct immediate injuries and certain long term injuries

and conditions. (<u>Id.</u> ¶ 39).  Plaintiff's injuries are recognized under Vermont law. (<u>Id.</u> ¶

40).

**F. Plaintiff's Life After Archmere.**  After graduation from Archmere, plaintiff

attended college at Villanova University in Villanova, Pennsylvania. (<u>Id.</u> ¶ 24).  He

majored in Biology, Chemistry and Mathematics and in 1990 he graduated *magna cum*

*laude*. (<u>Id.</u> ¶ 24).  Then in 1994, plaintiff obtained his Optometry degree, *with distinction*,

from Pacific University of Optometry. (<u>Id.</u> ¶ 24).  Subsequently, he joined the United

State Navy and has honorably served as a Medical Officer since 1994. (<u>Id.</u> ¶ 18).  Plaintiff

attained the rank of Lieutenant Commander and earned his Navy Wings of Gold and has

served as a Naval pilot and flight surgeon. (<u>Id.</u> ¶ 19-20).  Presently, plaintiff is a Naval

Medical Officer and designated Naval Aerospace Optometrist serving as a health care

administrator in Quantico, Virginia. (<u>Id.</u> ¶ 21).

His assignments with the Navy include the Naval submarine Base in Groton,

Connecticut; the Naval Recruiting District in New York City; Aberdeen Proving Ground,

in Aberdeen, Maryland; the Naval Air Station, in Pensacola, Florida; and presently the

Marine Corps Base, in Quantico, Virginia. (<u>Id.</u> ¶ 22).  Plaintiff is a highly decorated Navy

officer.  He is the recipient of the Meritorious Service Medal,  the Army Commendation

Medal, the Army Achievement Medal, and the military Outstanding Volunteer medal.

(Id. ¶ 23). Plaintiff is also the three time recipient of the Navy Commendation Medal and

the Navy Achievement Medal. (Id. ¶ 23). In spite of plaintiffs' struggles in forming

successful relationships with women, in 1997 he married. (Id. ¶ 50,52). The birth of his

two sons followed in late 2000 and early 2002. (Id. ¶ 56).

**G. Plaintiff's Spring of 2003 Discovery of the Causal Connection between**

**Defendant's Sexual Abuse and his Injuries.** After high school, plaintiff struggled with

confidence and self-esteem issues and consistently sought help in determining the nature

or cause of his problems. (Id. ¶ 50-51). In 1992, he began counseling, but no connection

was made between his childhood sexual abuse at the hands of Smith and his injuries or

present condition. (Id. ¶ 51). However, after plaintiff married in 1997, he began

experiencing difficulties in his marriage and he again turned to counseling to help

determine the root of his problems. (Id. ¶ 53). Again, no connection was made between

the sexual abuse and his problems. (Id. ¶ 54). However, in early 2000 during one heated

argument with his wife, she screamed "what happened to you to make you treat me this

way?" and for the first time plaintiff thought to tell her about the sexual abuse he had

suffered as a child. (Id. ¶ 55).

In 2003, plaintiff began therapy again and told the therapist of the horrific crimes

he had endured in high school by his priest. For the very first time, the therapist

connected this prior sexual abuse to plaintiff's current problems. (Id. ¶ 57). As plaintiff

began to painfully discover, the sexual abuse suffered because of Smith had indeed had a

long term negative impact on his life as an adult. (Id. ¶ 42-45,57-59). Because of one

priest's distorted sexual desires, plaintiff has endured conditions such as sexual

dysfunction, lack of marital intimacy, guilt, emotional pain, anger, loss of enjoyment of life, embarrassment, and other temporary and permanent personal injuries. (Id. ¶ 59). Yet, since 1992, plaintiff suffered from traumatic amnesia and as a result he suppressed these atrocious memories of his childhood sexual assaults and buried them deep within his psyche. (Id. ¶ 46).

**H. Smith's 2004 Admission of Wrongdoing.** In late 2004, plaintiff mustered up enough courage to confront Smith and his Nobertine religious superiors. (Id. ¶ 48). During this confrontation, Smith admitted his wrongdoing in the presence of others and admitted that he had sexually abused plaintiff. (Id. ¶ 48).

**I. Smith Acted at all Times as an Agent of Archmere and Diocese.** At all relevant times, Smith was the agent of Archmere and Diocese who were his principal. (Id. ¶ 64). Defendants Archmere and Diocese manifested an intention that Smith become their agent and act on their behalf. (Id. ¶ 64). Accordingly, Smith accepted and consented to serve and act on defendants' behalf as their agent and to be subject to their control. (Id. ¶ 64). Smith's actions were ratified, sanctioned, approved, affirmed, adopted or acquiesced in by Diocese and Archmere and such acts were enabled by the agency relationship. (Id. ¶ 66). By the existence of this agency relationship, Smith was aided in accomplishing the torts committed upon plaintiff. (Id. ¶ 72).

**J. Archmere and Smith Acted at All Times as Agents of Diocese.** Similarly, Diocese empowered Archmere and Smith to perform religious and educational duties and functions on behalf of Diocese. (Id. ¶ 67). Both accepted and consented to serve and act on Diocese's behalf as its agents. (Id. ¶ 67). Diocese conferred upon them the power to affect legal relations. (Id. ¶ 68). All actions were ratified, sanctioned, approved, affirmed,

9

adopted or acquiesced in by Diocese and such acts were enabled by the agency relationship. (Id. ¶ 69).

**K.  Archmere and Diocese were Negligent in Their Hiring, Supervision and Licensing of Smith.**  Smith was an employee of Archmere which was solely responsible for his hiring and supervision. (Id. ¶ 10, 61).  Likewise, Smith is a licensed priest of Diocese which was responsible for his initial licensing and continuing supervision. (Id. ¶ 12, 62).  Smith, as a licensed priest, was permitted to operate in the schools, homes, hospitals, parishes, and churches of the Diocese. (Id. ¶ 63).  If not for the Roman Catholic Church and Diocesan approval, Smith would not have been permitted to perform such sacerdotal functions or function as a priest or campus minister at Archmere. (Id. ¶ 63).

Importantly, both Archmere and Diocese were aware when they hired or licensed Smith of the prior charges of sexual molestation at St. John Newman.  Thus they were negligent in hiring and/or licensing Smith as a teacher and priest. (Id. ¶ 103-105).  Further, Archmere and Diocese were aware of Smith's continued inappropriate behavior toward and sexual molestation of plaintiff and failed to adequately supervise Smith. (Id. ¶ 103, 106-109).

**L.  Archmere and Diocese Also Breached Their Fiduciary Duties to Plaintiff and His Parents.**  Fiduciary relationships also existed between plaintiff on the one hand and Smith, Archmere and Diocese on the other. (Id. ¶ 73).  A fiduciary relationship is characterized by the highest degree of trust, confidence, good faith, honesty and candor, as well as prohibition against self-dealing. (Id. ¶ 73).  These relationships are similar, if not identical, to the fiduciary relationships and duties that characterize the lawyer-client, doctor-patient and clergyman-church member relationships. (Id. ¶ 74).  Such special

relationships existed between plaintiff and his parents and Smith, Archmere and Diocese. (Id. ¶ 74). Just like plaintiff, plaintiff's parents were members of the Roman Catholic religion and were faithful adherents to its doctrines, rituals, hierarchical organization and precepts. (Id. ¶ 74). Thus, as high ranking members or entities of the Roman Catholic religion, defendants' positions of the highest trust and spiritual authority formed a special fiduciary relationship with plaintiff and his parents. (Id. ¶ 75).

A fiduciary relationship was further formed when plaintiff and his parents placed trust in the faithful integrity of defendants and their agents as religious authorities and leaders. (Id. ¶ 75). By placing such trust, defendants were able to gain influence, superiority, religious control and responsibility over plaintiff. (Id. ¶ 76). Archmere and Diocese both breached their fiduciary duty to plaintiff by allowing Smith to function as a priest, campus minister and educator despite the foreseeable danger of Smith molesting children at Archmere. (Id. ¶ 77).

**M. The Damages Plaintiff Sustained as a Result of Smith's Childhood Sexual Abuse.** As a result of Smith's childhood sexual abuse, plaintiff has suffered distinct long term injuries and conditions. (Id. ¶ 40). These long term injuries and conditions include sexual dysfunction, lack of marital intimacy, guilt, emotional pain, anger, loss of enjoyment of life, embarrassment, and other temporary or permanent personal injury. (Id. ¶ 59).

After high school, plaintiff had difficulties connecting the psychological effects of the abuse because the traumatic events disrupted his memory function and cognition. (Id. ¶ 42). However, plaintiff does remember that after he left Archmere he had trouble forming successful relationships with women. (Id. ¶ 50). He also suffered from a severe

lack of confidence and self esteem. (Id. ¶ 50).  He was eventually able to find a woman with whom he formed a successful relationship and they married in 1997. (Id. ¶ 52).  Yet it was not long after they married that his marriage encountered difficulties. (Id. ¶ 53).  Plaintiff and his wife entered into counseling to try to determine the nature and cause of plaintiff's problems, but no connection was ever made between the abuse and any long term injury or condition he was experiencing. (Id. ¶ 53-54).

Early in 2000, at the peak of a heated argument with his wife, plaintiff's wife screamed "what happened to you to make you treat me this way!" (Id. ¶ 55).  For the first time, it occurred to plaintiff to tell his wife about his past childhood sexual abuse. (Id. ¶ 55).  After the birth of two children in 2000 and 2002, plaintiff began seeing a therapist and related his childhood sexual abuse as well as his emotional and psychical difficulties. (Id. ¶ 56-57).  Since then, plaintiff and his wife has worked painstakingly toward plaintiff's rehabilitation and the rehabilitation of their marriage and family. (Id. ¶ 58).

## ARGUMENT

### I.    STANDARD OF REVIEW.

"A complaint will withstand an attack under Federal Rule of Civil Procedure 12(b)(6) if the material facts as alleged, in addition to inferences drawn from those allegations, provide a basis for recovery."  Emerson v. Thiel College, 296 F.3d 184, 188 (3d Cir. 2002).  "[I]n deciding a Rule 12(b)(6) motion, factual allegations of the complaint are to be accepted as true and the complaint should be dismissed only if it appears to a certainty that no relief could be granted under any set of facts which could be proved. Reasonable factual inferences will be drawn to aid the pleader."  D.P. Enterprises, Inc. v. Bucks County Comty. College, 725 F.2d 943, 944 (3d Cir. 1984).

Stated another way, the trial court is "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994). See also Kulwicki v. Dawson, 969 F.2d 1454, 1462 (3d Cir. 1992) ("the plaintiff must be given the benefit of every favorable inference to be drawn"). In the 12(b)(6) context, "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record. Moreover, a case should not be dismissed for failure to state a claim unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations." Jordan, 20 F.3d at 1261.

The United States Supreme Court has repeatedly and explicitly rejected heightened pleadings standards and instead unanimously reaffirmed its long time holding that Fed.R.Civ.P. 8(a)(2) indeed means what it clearly says and that the required "short and plain statement of the claim" must simply "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz v. Sorema, N.A., 534 U.S. 506, 512 (2002); accord Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 164 (1993); Conley v. Gibson, 355 U.S. 41, 47 (1957); Evancho v. Fisher, 423 F.3d 347, 351-353 (3d Cir. 2005). "The liberal notice pleading of Rule 8(a) is the starting point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim." Swierkiewicz, 534 U.S. at 514. Notice pleading "relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Id. at 512. Given this simplified notice pleading standard, "a court may dismiss a complaint only if it

13

is clear that no relief could be granted under any set of facts that could be proved

consistent with the allegations." Id. at 514 (internal punctuation omitted).

II.    **UNDER DELAWARE'S CHOICE OF LAW PRINCIPLES VERMONT'S
       STATUTE OF LIMITATIONS APPLIES TO THIS CAUSE OF ACTION
       MAKING THE FILING OF THE COMPLAINT TIMELY UNDER
       VERMONT LAW.**

       A.    **The Guiding Principles Embodied in Delaware's Borrowing
             Statute Weigh in Favor of Applying Vermont's Statute of
             Limitations.**

       "A Federal District Court sitting in diversity in Delaware must apply Delaware

conflict of law rules in determining what state law will govern." Dymond v. NBC, Inc.,

559 F.Supp. 734, 735 (D.Del. 1983)(citing Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.,

313 U.S. 487, 496 (1941) and Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78 (1938)).

Delaware has adopted a borrowing statute to hold that in certain situations the statute of

limitations of a foreign state, rather than Delaware's limitation period, will apply.

Dymond, 559 F.Supp. at 735; see 10 Del.C. § 8121.   Delaware's borrowing statute,

before its recent judicial construction, states:

> Where a cause of action arises outside of this State, an action cannot be
> brought in a court of this State to enforce such cause of action after the
> expiration of whichever is shorter, the time limited by the law of this State,
> or the time limited by the law of the state or country where the cause of
> action arose, for bringing an action upon such cause of action. Where the
> cause of action originally accrued in favor of a person who at the time of
> such accrual was a resident of this State, the time limited by the law of this
> State shall apply.

10 Del.C. § 8121.  However, as both the Delaware Supreme Court and the District of

Delaware have recently held, this statute is *not to be read literally* so as to always apply

the shorter of two limitations periods. See Saudi Basic Industries Corp. v. Mobil Yanbu

Petrochemical Co., Inc., et al., 866 A.2d 1, 16-17 (Del. 2005); B. Lewis Productions, Inc.

v. Bean, 2005 WL 273298, *2-3 (D.Del. Jan. 28, 2005).  When the district court is faced

with two conflicting statutes of limitations, the court is guided by the legislature's

principles behind enacting the borrowing statute in determining which State's statute of

limitations to apply. Saudi, 866 A.2d at 16-17.

    The purpose behind Delaware's borrowing statute is to prevent forum shopping

and protect the residents of Delaware. Saudi, 866 A.2d at 15.  Borrowing statutes such as

Delaware's are typically enacted to prevent the "standard scenario" of a plaintiff bringing

a claim in a Delaware court that "(i) arises under the law of a jurisdiction other than

Delaware and (ii) is barred by that jurisdiction's statute of limitations but would not be

time-barred in Delaware, which has a longer statute of limitations." B. Lewis, 2005 WL

273298 at 2; Saudi, 866 A.2d at 16-17.  The borrowing statute's "purpose is to prevent

forum shopping by the plaintiff and to protect Delaware courts from having to adjudicate

stale foreign claims *if the foreign statute of limitation prescribes a shorter period*."

Delargy by Delargy v. Hartford Accident and Indemnity Co., 1986 WL 11562, *2

(Del.Super. Oct. 8,1986)(emphasis added).  "Delaware has made the policy determination

in conflict of law decisions that when a cause of action arises outside of Delaware, and

that action would be barred in the state in which it arose because of that state's statute of

limitations, the cause of action cannot be brought in Delaware." Dymond, 559 F.Supp. at

735.  The present case, however, does not fall within this "standard scenario."

    Plaintiff here has brought a claim in a District of Delaware court and seeks to

apply a foreign state's substantive law and statute of limitations *which has not expired*.

Contrary to the "standard scenario," in our present case plaintiff's claim is barred under

Delaware's strict two-year statute of limitations, thus making it impossible that plaintiff filed his claim in Delaware to avail himself of Delaware's statute of limitations and escape the limitation period of Vermont. See Saudi, 866 A.2d at 16 ("borrowing statutes 'are designed to prevent shopping for the most favorable forum.'"). Accordingly, the policy of Delaware's borrowing statute to prevent plaintiffs from forum shopping in Delaware does not warrant application of Delaware's borrowing statute. "To apply the borrowing statute and conclude that Delaware's statute of limitations would apply would basically turn the borrowing statute on its head for the purpose for which it was enacted." Saudi, 866 A.2d at 15. Accordingly, since the application of Vermont's six-year statute of limitations does not offend the statute's defining principles, Delaware's borrowing statute does not apply. See Saudi, 866 A.2d at 15; B. Lewis, 2005 WL 273298 at *2.

Furthermore, defense reliance on Hartz v. Diocese of Greensburg, 94 Fed.Appx. 52 (3d Cir. 2004), is misplaced. (D.I. 14 at 8; D.I. 16 at 11). In Hartz, the Third Circuit, sitting in diversity and applying Pennsylvania state law, affirmed the Western District of Pennsylvania's ruling that Pennsylvania's statute of limitations applied to that case. Although this Court also is sitting in diversity, it is faced with applying Delaware state law - which differs significantly from that of Pennsylvania on this issue. Here, this Court must apply the State of Delaware's borrowing statute in light of the Delaware General Assembly's intent in enacting it as well as in light of the Delaware Supreme Court's authoritative ruling in Saudi as to how this State of Delaware statute should be applied. Only then can this Court can determine whether Delaware or Vermont's statute of limitations applies. Thus, Hartz is inapplicable on this Delaware state law issue. Instead,

16

review of case law and principles underlying Delaware's borrowing statute dictate that it does not apply to our case.

Contrary to defense claims (D.I. 14 at 7), Elmer v. Tenneco Resins, Inc., 698 F.Supp. 535 (D.Del. 1988), does not dictate a different result because its interpretation of a Delaware state statute has since been invalidated by the Delaware Supreme Court. Elmer held that "[a] court must apply Delaware's borrowing statute...when a non-Delaware resident brings a cause of action in a Delaware court and the cause of action arose outside of Delaware." Elmer, 698 F.Supp. at 538. However, Elmer was decided in 1988, seven years before the seminal Delaware Supreme Court decision in Saudi which rearranged the legal landscape on the present issue. Saudi, 866 A.2d 1. Elmer applied this state law in the absence of an authoritative interpretation from the Delaware Supreme Court which has since given that authoritative interpretation in Saudi and reached a different result on this state law issue than was reached by the Elmer court. Accordingly, because this is a state law issue, the Delaware Supreme Court is the final authoritative source in interpretation and application of this state statute. See Prudential Property and Cas. Ins. Co. v. Pendleton, 858 F.2d 930, 934 (3d Cir. 1988); Camden County Board of Chosen Freeholders v. Beretta, U.S.A. Corp., 273 F.3d 536, 541 (3d Cir. 2001)("the role of a federal court ruling on a matter of state law in a diversity case is to follow the precedents of the state's highest court").

**B.    The Restatement (Second) Conflicts of Laws § 142, as Modified by the Delaware General Assembly, Also Points to Vermont's Statute of Limitations as Controlling.**

"Where the law of two different states may apply to an action, Delaware courts

apply the Restatement (Second) Conflicts of Laws to determine which state law applies." Juran v. Bron, 2000 WL 1521478, *10 (Del.Ch. Oct. 6, 2000).  Further, as defendant Diocese correctly points out (D.I. 16 at 13), "[w]ith respect to questions of which state's statute of limitations to apply, the courts are instructed by the Restatement to apply the statute of limitations of the forum." Id.  However, defendant Diocese fails to mention that in the subsequent paragraph of Juran, the Delaware Chancery Court continued by saying: "The General Assembly, however, has modified this general rule by statute" by adopting a borrowing statute. Id. at *11.  "The statute of limitations of the forum applies, *in the absence of a contrary statutory provision*." Hurtt v. McElroy, 1984 WL 553559, *1 (Del.Super. Mar. 30, 1984)(emphasis added); Restatement (Second) Conflicts of Laws §§ 118, 142; accord Pack v. Beech Aircraft Corporation, 132 A.2d 54 (Del. 1957).  Here, the Delaware General Assembly chose to modify the common law rule that the forum statute of limitations automatically applies when it adopted the borrowing statute. 10 Del.C. § 8121.  Therefore, the proper analysis of the statute of limitations issue is governed by Delaware's borrowing statute and its defining principles.  Under that analysis, Vermont's six year statute of limitations is applicable.

## C. Plaintiff's Cause of Action is Timely Under Vermont's Statute of Limitations.

Finally, plaintiff filed a timely cause of action pursuant to Vermont's statute of limitations which states in pertinent part:

> A civil action brought by any person for recovery of damages for injury suffered as a result of childhood sexual abuse shall be commenced within six years of the act alleged to have caused the injury or condition, or six years of the time the victim discovered that the injury or condition was caused by that act, whichever period expires later.

18

12 <u>V.S.A.</u> § 522.[1]  Plaintiff did not make the causal connection between Smith's acts of

sexual abuse committed upon him in Vermont and his long term emotional and

psychiatric injuries until the Spring of 2003. (Compl. ¶ 49).  Plaintiff then filed his

Complaint on November 17, 2005. (D.I. 1).  Accordingly plaintiff filed his claim well

within the six year time period allotted by Vermont's statute of limitations, making his

claim timely.

## III.    UNDER DELAWARE'S CHOICE OF LAW DOCTRINE, VERMONT HAS THE MOST SIGNIFICANT RELATIONSHIP TO PLAINTIFF'S CAUSE OF ACTION AND THEREFORE, VERMONT LAW APPLIES TO THIS CASE.

Delaware also has adopted the "most significant relationship" test of Restatement

(Second) Conflicts of Laws to determine choice of law questions.  <u>Travelers Indemnity</u>

<u>Co. v. Lake</u>, 594 A.2d 38 (Del. 1991).  "Pursuant to section 145 of the Second

Restatement, the local law of the state which 'has the most significant relationship to the

occurrence and the parties under the principles stated in § 6' will govern the rights of

litigants in a tort suit." <u>Id.</u> at 47 (quoting the Restatement (Second) Conflicts of Laws §

145(1) (1971)).  The Delaware Supreme Court in adopting the "most significant

relationship" test stated that the application of this test "does not require a court to

disregard a foreign jurisdiction's law in all torts cases," but "[t]he flexibility of this

doctrine requires that each case be decided on its own facts." <u>Travelers</u>, 594 A.2d at 48.

Section 6 of the Restatement lists the following relevant choice of law considerations:

---

[1] Further, plaintiff meets the retroactivity provision since the cause of action was commenced on or after July 1, 1990 and at least one act of Smith's sexual abuse and the discovery that the injury or condition was caused by the act of sexual abuse by Smith occurred on or after July 1, 1984. 12 <u>V.S.A.</u> § 522 (History); <u>Earle v. State</u>, 743 A.2d 1101, 1106 (Vt. 1999).

> (a) the needs of the interstate and international systems,
>
> (b) the relevant policies of the forum,
>
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
> (d) the protection of justified expectations,
>
> (e) the basic policies underlying the particular field of law,
>
> (f) certainty, predictability and uniformity of result, and
>
> (g) ease in the determination and application of the law to be applied.

Restatement (Second) Conflicts of Laws § 6 (1971).  Further, section 145 applies directly to causes of action in tort and lists the following relevant contacts a court should consider when applying the choice of law considerations of section 6:

> (a) the place where the injury occurred,
>
> (b) the place where the conduct causing the injury occurred,
>
> (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
>
> (d) the place where the relationship, if any, between the parties is centered.

Restatement (Second) Conflicts of Laws § 145(2) (1971).  "The tests are qualitative not quantitative." Kubasko v. Pfizer, 2000 WL 1211219, *2 (Del.Super. Jun. 30, 2000). Importantly, "[t]he test does not merely measure the interest of the two sides and apply the law of the jurisdiction with the most contacts, but rather evaluates the quality of the contact according to their relative importance with respect to a particular issue. Thomas v. Sanford, 2000 WL 1211136, *1 (Del.Super. Jan. 11, 2000); see Travelers, 594 A.2d at 47 ("These contacts are to be evaluated according to their relative importance with respect to

20

the particular issue.").

Finally, section 146 mandates that:

> In an action for a personal injury, the local law of the state where the
> injury occurred determines the rights and liabilities of the parties, unless,
> with respect to the particular issue, some other state has a more significant
> relationship under the principles stated in § 6 to the occurrence and the
> parties, in which event the local law of the other state will be applied.

Restatement (Second) Conflicts of Laws § 146 (1971). "Even though that presumption

exists, th[e] Court is compelled to utilize § 145 and § 6 principles in determining the

choice of law." Kubasko, 2000 WL 1211219 at *2.

## A.    Section 145 Determines the Relevant Contacts to be Taken into Consideration.

The first step is to evaluate the principles set forth in section 145 of the

Restatement to determine the contacts the court is to use in applying section 6 principles.

Id.; Kellam v. McDevitt & Street Co., 1994 WL 319123, *3 (Del.Super. Jun. 23, 1994).

"In applying the principles of section 6...the forum should give consideration to the

relevant policies of all potentially interested states and the relevant interests of those

states in the decision of the particular issue." Restatement (Second) Conflicts of Laws §

145 cmt. e. "Those states which are most likely to be interested are those which have one

or more of the following contacts with the occurrence and the parties." Id.

(a) The Place Where the Injury Occurred.  Over the course of four long

tortured nights, spread out over several weekends, defendant Smith committed

innumerable perverse acts of sexual abuse upon plaintiff in Vermont.  The place of injury

is of particular importance in personal injury cases. Restatement (Second) Conflicts of

Laws § 145 cmt. f.  "In the case of personal injuries...the place where the injury occurred

21

is a contact that...plays an important role in the selection of the state of the applicable law." Restatement (Second) Conflicts of Laws § 145 cmt. e.  The guiding principle behind this is that "persons who cause injury in a state should not ordinarily escape liabilities imposed by the local law of that state on account of the injury." Id.  It is only when "[t]he place of injury does not play an important role [can it] be said to be fortuitous or when for other reasons it bears little relation to the occurrence and the parties with respect to the particular issue." Thompson v. Reinco, Inc., 2004 WL 1426971, *1 (Del.Super. June 15, 2004).

        In the case at hand, the place of injury is not fortuitous as it plays the key role in the very occurrences at the root of this lawsuit. See Restatement (Second) Conflicts of Laws § 145 cmt. e.  This is not a case where Smith molested plaintiff while merely passing through another state.  Cf. Rasmussen v. Uniroyal Goodrich Tire Co., 1995 WL 945556, *2 (Del.Super. Aug. 18, 1995)(holding the place of injury was fortuitous when plaintiff's injury took place in a state she was merely driving through to get to yet another state); Ison v. E.I. DuPont de Nemours and Co., Inc., 729 A.2d 832, 844 (Del. 1999)("Airplane accidents are an example of fortuitous injuries because the victim often has no connection to the place of the crash.").  Instead, while acting as plaintiff's priest and teacher, Smith purposefully removed the minor plaintiff from Delaware and intentionally took him into Vermont.  Plaintiff was transported to Vermont on several separate occasions, where Smith took full advantage of the long distance from plaintiff's family and sexually molested and abused him innumerable times over the course of two horrific long weekends.  The place of injury plays the central role in the occurrences at

22

the heart of this lawsuit since it where plaintiff was tortiously wronged and sexually

molested countless times by defendant Smith.

**(b) The Place Where the Conduct Causing the Injury Occurred.** The

negligent conduct causing the injury occurred in both Delaware and Vermont. Smith's

conduct, which directly caused the injuries to plaintiff, occurred in Vermont. The

Diocese and Archmere's negligent licensing and hiring of Smith as a teacher and priest

occurred in Delaware. However, when Smith took plaintiff to Vermont he was at all

times acting as an agent for Archmere and Diocese. Additionally, since neither defendant

properly supervised Smith's off-campus trips to Vermont with plaintiff, their negligent

supervision of Smith also occurred in Vermont. Accordingly, the place where the

conduct occurred is not easily ascertainable as defendants' conduct occurred both in

Vermont and Delaware. The place where the conduct occurred is only given particular

weight when "the injury occurred in two or more states, or when the place of injury

cannot be ascertained or is fortuitous and...bears little relation to the occurrence and the

parties." Restatement (Second) Conflicts of Laws § 145 cmt. e. Such is not the case here

because the injury occurred in one, not two, states; the place of injury certainly is

ascertainable and it is not fortuitous. So this factor is unhelpful.

**(c) The Domicile, Residence, Nationality, Place of Incorporation and**

**Place of Business of the Parties.** At the time of his sustained injuries, plaintiff was

domiciled and resided in Pennsylvania. (Compl. at ¶ 7). Currently, plaintiff is domiciled

and resides in Virginia. (Id.). Defendant Smith is domiciled and resides in Delaware. (Id.

at ¶ 13). Archmere and Diocese are Delaware corporations with their principle places of

23

business in that state. (Id. at ¶¶ 9, 11).  Accordingly, this factor is unhelpful as there is no common state where the parties are connected. See Pittman v. Maldania, Inc., 2001 WL 1221704, *3 (Del.Super. July 31, 2001).  "The importance of [these] contacts will frequently depend upon the particular issue involved." Restatement (Second) Conflicts of Laws § 145 cmt. e.  Further, because this is a personal injury tort action, this factor's importance depends upon the extent they are grouped with other contacts. Id.  "The fact...that one of the parties is domiciled or does business in a given state will usually carry little weight of itself."  Id.  This factor only has particular weight when all parties are grouped in a particular state. Id.  Such is not the case here and this factor is also not helpful.

> (d) The Place Where the Relationship, If Any, Between the Parties is Centered.  The place where the relationship is centered is most likely Delaware.  Plaintiff attended school in Delaware and Delaware is the place where the parties came together.  However, only "[o]n rare occasions [is] the place where the relationship is centered...the most important contact." Restatement (Second) Conflicts of Laws § 145 cmt. e.  For example, in Rasmussen, the court stated that "[t]he place where the relationship of the parties is centered has perhaps greater significance...*than might otherwise be ascribed to this contact* because the multi-state contacts involved here are so scattered and the place of injury was in large part fortuitous." 1995 WL 945556 at *3 (emphasis added).  Such is not the case here because the place of injury is not fortuitous and there are no multi-state contacts.  The only two states involved are Vermont and Delaware.  Thus, even though the party's relationship appears to be centered in Delaware, this section 6 principle is

24

given little weight in comparison to the other factors since there is no "rare" situation
which affords it more importance.

    **B.    Section 146's Presumption that the State of Injury Controls is Only
        Overcome by Showing Another State has a More Significant Interest.**

        Second, the Court should analyze each of these aforementioned contacts in the
context of section 146 of the Restatement, which emphasizes the predominant importance
of the location of the injury in a tort action. Kellam, 1994 WL 319123 at *3. Basically,
section 146 "creates *a presumption* that the law of the state in which the injury occurred,
in this case [Vermont], will be the proper law to apply unless another interested state ...
has a more significant interest in the litigation." Id. at *4 (emphasis added). It is the
court's duty to determine "whether Delaware's relationship to the parties outweighs
[Vermont's] interest in protecting those persons injured within its borders." Id. In order
to do this, the principles set forth in section 6 next must be addressed.

    **C.    Section 6 Principles.**

        "[T]o determine the significance of each state's interest, the Court must consider
the principles set forth in Restatement § 6." McBride v. Whiting-Turner Contracting Co.,
1993 WL 489487, *2 (Del.Super. Oct. 21, 1993).

        **(a) The Needs of the Interstate and International Systems.** "The
rationale behind this consideration is the desire to further harmonious relations between
the states and facilitate commercial intercourse between them." Kellam, 1994 WL 319123
at *4; Restatement (Second) Conflicts of Laws § 6 cmt. d. In the case at hand, "neither
states' system will be greatly affected by the choice of law decision in this case." Id.; see
also McBride, 1993 WL 489487 at *3. The case is rather unique and will not undermine

25

the law in either jurisdiction. Accordingly, this factor is unhelpful.

**(b) The Relevant Policies of the Forum.** Delaware provides for a strict two year statute of limitations for personal injury actions, including actions based on claims of childhood sexual abuse. 10 <u>Del.C.</u> § 8119. Delaware's purpose behind the strict application of its statute of limitation is "to prevent the revival of stale claims in which prejudice may result to a party due to the loss of evidence and witnesses." <u>Garcia v. Nekarda</u>, 1993 WL 54491, *2 (Del.Super. Feb. 19, 1993)(citing <u>Railroad Telegraphers v. R.Y. Express Agency</u>, 321 U.S. 342, 348-349 (1944)). "Any expansion of the statutes of limitation involves important public policy considerations best left to the legislature who may receive facts and testimony with time for reflection upon countervailing societal interests." <u>Garcia</u>, 1993 WL 54491 at *2; <u>accord</u> <u>Reyes v. Kent General Hosp., Inc.</u>, 487 A.2d 1142 (Del. 1984). Delaware's main concern in this is to prevent stale claims because there is a possibility evidence and/or witnesses may be difficult to locate. Victims in Delaware are only able to bring a cause of action for childhood sexual abuse if they make the connection between their injuries and the abuse within two years. No loophole will be created in this policy by just the one present case.

**(c) The Relevant Policies of Other Interested States and the Relative Interests of Those States in the Determination of the Particular Issue.** Conversely, Vermont admirably provides for a more plaintiff friendly statute of limitations for victims of childhood sexual abuse. 12 <u>V.S.A.</u> § 522. In Vermont, a victim can commence an action within six years of the act or six years of the time the victim discovered that the injury or condition was caused by that act, whichever period expires later. <u>Id.</u> The

Vermont Legislature has specifically enacted a longer statute of limitations for victims of childhood sexual abuse that occurs within that state. See Barquin v. Roman Catholic Diocese of Burlington, Vermont, Inc., 839 F.Supp. 275, 279-80 (D.Vt. 1993). For all other personal injury actions, the statute of limitations is only three years. 12 V.S.A. § 512(1)-(4). The purpose behind section 522 is to allow victims of childhood sexual abuse, especially those who have encountered difficulties connecting the abuse to their injuries, a longer time to bring their cause of action and to hold perpetrators accountable.

The policy considerations with regard to Delaware and Vermont's statue of limitations for personal injury, specifically injury from childhood sexual abuse, are in direct conflict. See Jackson v. Phillips, 1999 WL 463524, *3 (Del.Super. Apr. 6, 1999)(finding that two states endorsed contradictory policies and the policies are incapable of resolution). Accordingly, neither the policies of the Delaware or Vermont will be furthered by application of the other state's statute of limitations. "Every rule of law...was designed to achieve one or more purposes. A court should have regard for these purposes in determining whether to apply its own rule or the rule of another state." Restatement (Second) Conflicts of Laws § 6 cmt. e. An important factor to keep in mind here is that the policy behind Vermont's lenient statute of limitations is to allow victims of childhood sexual abuse to have their day in court to try to remedy the lifelong injury they have been forced to endure. Delaware's policy considerations are only to prevent stale claims which may have trouble being prosecuted due to the loss of evidence or witnesses. The victim's ability to gain redress for his injuries in Delaware is no longer a consideration after the expiration of two years. Given that Vermont has specifically

27

addressed concerns involving victims of childhood sexual abuse, "it is fitting that the state whose interests are most deeply affected should have its local law applied." Restatement (Second) Conflicts of Laws § 6 cmt. f.  Such is our present case.

      **(d) The Protection of Justified Expectations.**  "This factor is of little importance to a personal injury case."  <u>Judge Trucking Co. Inc. v. Estate of Cooper</u>, 1994 WL 680029, *5 (Del.Super. Sept. 19, 1994).  "There are occasions, particularly in the area of negligence, when the parties act without giving thought to the legal consequences of their conduct or to the law that may be applied." Restatement (Second) Conflicts of Laws § 6 cmt. g.  "In such situations, the parties have no justified expectations to protect, and this factor can play no part in the decision of a choice-of-law question." <u>Id.</u> Accordingly, defendants' claims that they "had no idea that they would be subject to Vermont laws," are groundless and entirely without merit. (D.I. 16 at 9).  This factor should not be taken into consideration because the claims against defendants arise in the field of negligence.

      **(e) The Basic Policies Underlying the Particular Field of Law.**  "Tort law policies...influence the standards and procedures used to determine liability, fix compensation, and deter tortious conduct." <u>NL Industries, Inc. v. Commercial Union Ins. Co.</u>, 65 F.3d 314, 328 (3d Cir. 1995); <u>Judge Trucking</u>, 1994 WL 680029, *5 ("The basic policies underlying the field of torts is deterrence of tortious conduct and compensation of a victim.").  "The relative strength of [a state's] interest depends on the balance of policies - such as compensating victims or deterring culpable conduct - struck by the relevant tort laws." <u>NL Industries, Inc.</u>, 65 F.3d at 328 (citing Restatement (Second)

Conflicts of Laws § 145 cmt. c).  Both Vermont and Delaware have interests in deterring

conduct by tortfeasors, however only Vermont is concerned with providing redress for

victims of childhood sexual abuse who may have encountered difficulties connecting

their injuries to the abuse.  Thus, the two states' policies reflect a differing view of tort

law. Jackson, 1999 WL 463524 at *4.

    However, the application of one state's laws may be to the detriment of the other

state's policies with regard to the particular area of the law.  For example, in Judge

Trucking, the court stated that while Maryland had a significant interest in deterring

tortious conduct, Delaware also had a significant interest in compensating its residents

who are injured victims. 1994 WL 680029, *5.  Thus the application of Maryland's cap

on the amount of non-economic damages which a party may recover from a

non-governmental entity would be contrary to Delaware's interest. Id.  The court stated

that the application of Maryland's non-economic cap "would have no impact on

Maryland's citizens or the state of its insurance industry, and thus, Maryland's interest in

the resolution of this issue is minimal" while "Delaware has an interest in seeing that its

citizens recover all that a jury awards them." Id.  So there this Delaware court held that

"Delaware's interest was greater, *qualitatively*, than is Maryland's." Id. (emphasis added).

Similarly, in our present case the Court should recognize Vermont's greater interest in

full redress for victims under tort law.

    "[T]here is good reason for the court to apply the local law of that state which will

best achieve the basic policy, or policies, underlying the particular field of law involved."

Restatement (Second) Conflicts of Laws § 6 cmt. h.  Here in the case at hand, *only*

Vermont promotes the basic policies of tort law, "to determine liability, fix compensation, and deter tortious conduct." NL Industries, 65 F.3d at 328. Delaware, provides no redress for victims who may have had difficulty connecting their injuries to their abuse and essentially encourages childhood sex abusers to hide their crimes for at least two years to let the statute of limitations expire. Vermont's contrary policies clearly promote the greater principles embodied in tort law. See Judge Trucking, 1994 WL 680029, *5 (holding that Maryland's non-economic cap in personal injury action was contrary to Delaware's interest in fully compensating its victims and worked against the policy of deterring tortious conduct.).

Furthermore, this case involves tort issues of substantial importance to all Vermont citizens. In re Nationwide Mut. Ins. Co. v. Wooters, 1996 WL 280778, *3 (Del.Super. Jan. 31, 1996). Smith purposefully brought plaintiff within Vermont's borders and committed multiple crimes and caused severe injuries there. If Delaware law is applied, "[p]laintiff's action will be dismissed under a set of facts which may present a viable cause of action under [Vermont] law." Id. Accordingly, Vermont has an important interest in seeing plaintiff's claim decided according to Vermont law which would allow plaintiff's cause of action to remain viable. Id.

**(f) Certainty, Predictability and Uniformity of Result.** This factor tends to play a more important role in conflict of law cases dealing with contracts. See Kellam, 1994 WL 319123, *5. "This is an insignificant factor in the field of torts." Judge Trucking, 1994 WL 680029, *5. Further, "[t]his policy should not be overemphasized, since it is obviously of greater importance that choice-of-law rules lead to desirable

30

results." Restatement (Second) Conflicts of Laws § 6 cmt. j. This factor is unhelpful in determining whether to apply Vermont or Delaware law.

(g) **Ease in the Determination and Application of the Law to be Applied.** The final factor is equally unhelpful. This Court would have no difficulty in applying either Vermont's or Delaware's law. Jackson, 1999 WL 463524, *4; Judge Trucking, 1994 WL 680029, *5; McBride, 1993 WL 489487, *5.

**D.    Consequently Vermont is the State with the Most Significant Relationship.**

The above conflict of law analysis under the Restatement clearly demonstrates that Vermont is the state with the most significant relationship to this cause of action. Under section 145's analysis to determine relevant contacts, Vermont is the place of injury and that is dispositive. Other factors are inconclusive or inapplicable.

The second step of the conflict of law analysis under section 146 states that the law of the place of injury should control absent another state having a more significant interest in the action determined under the principles of section 6. But under the section 6 principles, section's 146 presumption controls as Delaware does not have a more significant interest in the cause of action. The three section 6 principles having the most application and import - (b) the relevant policies of the forum, (c) the relevant polices of other interested states, and (e) the basic policies underlying the particular field of law - all demonstrate that Vermont law has strong policies in punishing tortfeasors and compensating victims, as well as allowing victims to bring their cause of action in a court of law. These polices are not outweighed by Delaware's policies of preventing causes of actions for victims of childhood sexual abuse because there is a mere possibility of stale

31

evidence and witnesses.  Accordingly, Vermont law is clearly the state with the "most significant relationship" to the cause of action.  The defense argument fails since the law persuasively supports plaintiff.

## IV.    SALTARELLI IS A PROPER DEFENDANT BECAUSE HE IS SUED IN HIS OFFICIAL CAPACITY AS THE AGENT OR ALTER-EGO OF THE DIOCESE.

As the Complaint clearly states, defendant Saltarelli is being sued solely "in his official capacity as agent or alter ego of the Diocese."  (Compl. ¶ 14).  Likewise, on page two of his Memorandum of Law, Saltarelli acknowledges that he is being sued only "in his official capacity." (D.I. 15).

As a result, plaintiff is at a loss as to why this defendant surveys the state of piercing the corporate veil law in Delaware and believes he is being sued personally.  If Saltarelli has a guilty conscience and wishes to admit involvement in the loathsome events at issue in this case, plaintiff would be willing to listen and then consider amending the Complaint.  Short of that, plaintiff stands by his Complaint which clearly and explicitly states that Saltarelli is being sued solely in his official capacity.

## V.    SALTARELLI IS A PROPER OFFICIAL CAPACITY DEFENDANT FOR PURPOSES OF EXECUTING JUDGMENT AGAINST DIOCESE SHOULD THE DIOCESE'S ASSETS BE HELD IN SALTARELLI'S NAME.

Saltarelli is sued only in his official capacity "as agent or alter ego of the diocese for purposes of collecting a money judgment against the Diocese, *should* [the Diocese's] assets be titled in his name." (Compl. ¶ 14)(emphasis added).  Thus, defendant's assertion that the complaint makes no allegation that the assets of the Diocese are held in Saltarelli's name is disingenuous. (D.I. 15 at 5).  Furthermore, defendant's allegation that

plaintiff's claim is predicated on a "theory" is in direct opposition to evidence this same defendant submitted in a previous lawsuit which proves the assets are held in the name of the current Bishop. See Eden v. Oblates of St. Francis de Sales, et al., C.A. No. 04C-01-069 CLS (Del.Super.)(D.I. 16, Exhibit A).[2]  In Eden, defendant Saltarelli attached as an exhibit to his Opening Brief in Support of his Motion to Dismiss the Certificate of Incorporation of Catholic Diocese of Wilmington, Inc. which specifically states the entire membership of the Corporation consists of the current Bishop and its assets are held in his name. (Attached as Tab A).  This piece of evidence formed the entire basis for plaintiff's allegations that the assets of the Diocese are held in the name of Saltarelli.

Additionally, defendant makes the bare allegation that there is no basis to sue an officer/director of a corporation to execute a judgment without giving any citation to supporting law. (AB at 5).  Under principles of notice pleading plaintiff is only required in his complaint to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." Swierkiewicz, 534 U.S. at 512; Fed.R.Civ.P. 8(a).  "[A] detailed recitation of the proof that will in the end establish such a right [to relief]" is not necessary. Gavura v. Pennsylvania State House of Representatives, 55 Fed.Appx. 60, 63 (3d Cir. 2002).  Plaintiff satisfied the simplified pleading requirement of Rule 8(a) by giving defendants fair notice of the basis for his claim and accordingly it should not be dismissed. Swierkiewicz, 534 U.S. at 514-15 (2002).

_____

[2] Additionally, this evidence was submitted under the signature of the same attorney, Anthony G. Flynn, Esq., who also represents defendant Saltarelli in this present action.

## CONCLUSION

For the aforementioned reasons, defendants' Motions to dismiss the Complaint pursuant to Rule 12(b)(6) should be denied.  The relevant policies of Vermont and the basic policy of compensation for wrongful acts which undergirds tort law both dictate that the defendants be made to defend this action.


Respectfully Submitted,

**THE NEUBERGER FIRM, P.A.**

/s/ Thomas S. Neuberger
**THOMAS S. NEUBERGER, ESQ. (#243)**
**STEPHEN J. NEUBERGER, ESQ. (#4440)**
Two East Seventh Street, Suite 302
Wilmington, Delaware 19801
(302) 655-0582
TSN@NeubergerLaw.com
SJN@NeubergerLaw.com

Date: September 22, 2006          Attorneys for Plaintiff

34

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **Lt. Commander KENNETH J. WHITWELL,** | : | |
| **U.S. Navy,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | |
| | : | **C.A.No.05-796-SLR** |
| **ARCHMERE ACADEMY, INC., a Delaware** | : | |
| **corporation; CATHOLIC DIOCESE OF** | : | |
| **WILMINGTON, INC., a Delaware corporation;** | : | |
| **Rev. EDWARD SMITH, individually and in his** | : | |
| **official capacity; and Rev. MICHAEL A.** | : | |
| **SALTARELLI, in his official capacity,** | : | |
| | : | |
| **Defendants.** | : | |


## ORDER


This _____ day of _____, 2006, it is hereby

ORDERED that defendants' Motions to Dismiss (D.I. 14, 15 and 16) are hereby

DENIED.


_____

**THE HONORABLE SUE L. ROBINSON, U.S.D.J.**

# TAB

# A



## Delaware

PAGE 1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF
DELAWARE, DO HEREBY CERTIFY THE ATTACHED ARE TRUE AND CORRECT
COPIES OF ALL DOCUMENTS ON FILE OF "CATHOLIC DIOCESE OF
WILMINGTON, INC." AS RECEIVED AND FILED IN THIS OFFICE.

THE FOLLOWING DOCUMENTS HAVE BEEN CERTIFIED:

CERTIFICATE OF INCORPORATION, FILED THE FIFTH DAY OF
DECEMBER, A.D. 1972, AT 9 O'CLOCK A.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID
CERTIFICATES ARE THE ONLY CERTIFICATES ON RECORD OF THE
AFORESAID CORPORATION.



0787107  8100H

020656856

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State
AUTHENTICATION: 2064159

DATE: 10-31-02

## CERTIFICATE OF INCORPORATION

### OF

### CATHOLIC DIOCESE OF WILMINGTON, INC.

FIRST:    The name of the Corporation is CATHOLIC DIOCESE OF WILMINGTON, INC.

SECOND:    The registered office and location of the Corporation in the State of Delaware is at 1925 Delaware Avenue, in the City of Wilmington, County of New Castle, and the name and address of its registered agent is the Corporation itself whose address is 1925 Delaware Avenue, Wilmington, Delaware.

THIRD:    The objects and purposes proposed to be promoted, carried on, and transacted by the Corporation are as follows:

To promote the teachings of Jesus Christ, as taught and set forth by the Roman Catholic Church, throughout the territory of the Diocese of Wilmington now or hereafter assigned.

To serve as the legal entity by which the Ordinary of the Roman Catholic Diocese of Wilmington, who shall be appointed from time to time in accordance with the rules, regula- tions and discipline of the Roman Catholic Church, shall conduct the temporal affairs of the Roman Catholic Diocese of Wilmington.

Inasmuch as material possessions and business transactions are both practically and legally essential to the accomplishment of the primary purposes, this Corporation shall be endowed with all of the powers, rights, privileges, and authority granted by the General Corporation Law of the State of Delaware as the same now is enacted, and as it may be amended from time to time,

including, without limitation, the following powers:

To purchase, hold, use and take by gift, grant, devise or bequest, real property, personal and mixed property, choses in action of whatsoever kind or nature and wheresoever situate, whether within or outside the State of Delaware, and to grant, bargain and sell, give, exchange, lease, assign, mortgage, pledge, encumber, restrict, transfer, and set over the aforesaid types and kinds of property, whenever and however desired, and, in general, to manage, use, dispose of and deal with the aforesaid types and kinds of property as fully and amply as an individual natural person may do under the law;

To enter into, make and perform contracts of every kind and description with any person, firm, association, corporation or government;

To acquire by purchase, subscription, or otherwise, and to own, hold for investment, and to use, sell, assign, transfer, mortgage, pledge, exchange, or otherwise dispose of shares of stock, bonds, debentures, notes, scrip, securities, evidences of indebtedness, contracts, or obligations of any corporation or corporations, association or associations, domestic or foreign, or any firm or individual, or of the United States or any State territory or dependency of the United States, or of any foreign government or governmental subdivision, and while the owner or holder of any such property to receive, collect, and dispose of, the interest, dividends and income on or from such property and to possess and exercise, in respect thereof, all of the rights, powers and privileges of ownership, including all voting powers thereon;

To purchase real property and rights and interest therein of all kinds, both within and outside the State of Delaware.

To purchase or otherwise acquire, own, mortgage, pledge, sell, assign, and transfer, or otherwise dispose of personal property of every class and description;

To borrow or raise monies for any of the purposes of the corporation and, from time to time, without limit as to amount, to draw, make, accept, endorse, execute and issue promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments, and evidences of indebtedness, and to secure the payment of any thereof and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the corporation, whether at the time owned or thereafter acquired and to sell, pledge or otherwise dispose of such bonds or other obligations of the corporation for its corporate purposes;

To act as Trustee in any case where real, personal or mixed property is received by grant, gift, devise or bequest, in trust, to be used for the Corporation's religious, educational or charitable purposes in accordance with the terms and conditions of said trust.

FOURTH:    This Corporation is not organized for profit, and no capital stock shall ever be issued, and no dividends shall ever be paid.

FIFTH:    The name and mailing address of the incorporator is Most Reverend Thomas J. Mardaga, D.D., 1925 Delaware Avenue, Wilmington, Delaware.

SIXTH:    The membership of the Corporation shall consist of that one person who is the duly appointed Ordinary of the Roman Catholic Diocese of Wilmington as the same may from time to time be chosen in accordance with the rules, regulations, and discipline of the Roman Catholic Church, said Ordinary presently

-3-

being the Most Reverend Thomas J. Mardaga, D. D., who constitutes
the Corporation sole.

During any vacancy in the Office of the
Ordinary of the Diocese of Wilmington due to death, transfer, or
resignation, the sole membership of the corporation shall there-
upon pass to the interim Administrator of the Diocese of Wilmington
whose succession shall be determined in accordance with the rules,
regulations, and discipline of the Roman Catholic Church until
there is so duly appointed a successor Ordinary of the Diocese of
Wilmington or an Apostolic Administrator thereof.

During any prolonged disability of the Ordinary
of the Diocese of Wilmington, if no Apostolic Administrator has
been duly appointed for the Diocese of Wilmington, the sole
membership of the corporation shall be the then Vicar General of
the Diocese of Wilmington, but if there be then in office more
than one such Vicars General, the sole membership shall be that
Vicar General who is a Coadjutor or an Auxiliary Bishop, if such
there be, but if there be no Vicar General who is a Coadjutor or
an Auxiliary Bishop, then the sole membership shall be such
Vicar General then in office who was designated by the Ordinary
of the Diocese of Wilmington to assume the powers of such
Ordinary's office, but if there be no such designated Vicar
General, then the sole membership shall be that Vicar General of
the Diocese of Wilmington who was last in time duly appointed.

The rights and procedure of succession herein
governing the selection of the sole member shall be in lieu of
and shall eliminate the need for annual elections of the sole
member.

SEVENTH:    There shall be such officers of the corporation
as shall from time to time be appointed annually by the person who
then constitutes the sole membership of the corporation as the
By-Laws shall prescribe; such officers, if any, shall exercise the

-4-

respective duties ordinarily exercised by the secretary,
treasurer, or other officers commonly elected by a stock corpora-
tion. At all times, the sole member shall be the President and
Chief Executive Officer of the Corporation.

EIGHTH:    The sole member of the corporation shall
have the full and entire voting power of the corporation to the
exclusion of every officer, employee, or other person, firm or
corporation.

NINTH:    The corporation shall have perpetual exis-
tence.

TENTH:    The private property of the sole member,
of officers, agents, or employees shall not be subject to the
payment of corporate obligations.

ELEVENTH:    The corporation may in its By-Laws choose
to confer such powers, authority, and duties as the sole member
deems desirable upon a person or an advisory board, executive
committee, or council of administration and to designate persons
to occupy such positions in such numbers and for such terms as the
By-Laws shall provide.

TWELFTH:    Meetings of the corporation may be held
and the corporate records may be kept within and outside the State
of Delaware, subject to compliance with the provisions of the
General Corporation Law of the State of Delaware.

THIRTEENTH:    Notwithstanding anything to the contrary
hereinbefore declared, the entire assets of this corporation,
without exception, whether they be presently held or hereafter
acquired in the future, shall be and are hereby, upon any possible
dissolution of this corporation, solely dedicated to advance and
to further the religious purposes of the Roman Catholic Church and
shall be distributed at the time of dissolution only for such tax-
exempt religous purposes, provided such distributions qualify
as tax-exempt purposes under the Internal Revenue Code and Treasury

-5-

Department Regulations as the same may now exist or may hereafter be amended from time to time. Under no circumstances, whether upon dissolution, death of the sole member, or any other eventuality, shall any assets of this corporation inure to or be distributed, to or for the benefit of the sole member or any officer of this corporation as personal estate.

FOURTEENTH:    The corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation in the manner which is now or which may hereafter be prescribed by statute.

I, THE UNDERSIGNED, being the sole incorporator hereinbefore named, for the purpose of forming a corporation under the General Corporation Law of the State of Delaware, do make this Certificate, hereby declaring and certifying that the facts herein stated are true, and I have accordingly hereunto set my hand and affixed my seal the _4 th_ day of _December_ A. D. 1972.

_Thomas J. Mardaga_ (SEAL)
MOST REVEREND THOMAS J. MARDAGA, D.D.
Bishop of Wilmington

BE IT REMEMBERED, That on this _4 th_ day of _December_, A. D. 1972, personally came before me the Subscriber, a Notary Public for the State of Delaware, the MOST REVEREND THOMAS J. MARDAGA, D. D., party to the foregoing Certificate of Incorporation, known to me personally to be such, and acknowledged the said Certificate to be the act and deed of the signer and that the facts therein stated are truly set forth.

GIVEN under my hand and seal of office, the day and year aforesaid.

NOTARY PUBLIC

0007

## CERTIFICATE OF SERVICE

I, Stephen J. Neuberger, being a member of the bar of this Court do hereby certify

that on September 22, 2006, I electronically filed this **Brief** with the Clerk of the Court

using CM/ECF which will send notification of such filing to the following:


Anthony G. Flynn, Esq.
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391


Mark L. Reardon, Esq.
Ezlufon Austin Reardon Tarlov & Mondell, P.A.
300 Delaware Avenue, Suite 1700
P.O. Box 1630
Wilmington, DE 19899-1630


/s/ Stephen J. Neuberger
**STEPHEN J. NEUBERGER, ESQ.**

Whitwell/ Briefs / Motion to Dismiss AB.FINAL